# LICENSING AGREEMENT

**THIS AGREEMENT** made as of 1st of June, 2005 by and between **SYNCA DIRECT, INC.**, a Delaware Corporation with offices in the city of Le Gardeur, Quebec, Canada, at 337 Marion, Le Gardeur, Quebec, Canada J5Z 4W8 (hereinafter referred to as "User") and Image Level, a Belgium Corporation with offices in the city of Nieuwkerken-Waas, Belgium, at Nieuwkerkenstraat 29, 9100 Nieuwkerken-Waas (hereinafter "Vendor").

**WHEREAS**, User desires to acquire from Vendor, a perpetual exclusive right and license to use the Product (hereinafter the "Product") on the terms and conditions herein set forth, and Vendor desires to provide the Product to the User.

**NOW THEREFORE**, in consideration of the premises, mutual covenants and agreements herein contained, the parties hereto for themselves, their lawful successors and assigns, hereby covenant and agree as follows:

## ARTICLE I
## TERM

1.01   This Agreement commenced on the 1st of June, 2005 and shall continue in perpetuity unless terminated as provided for herein.

## ARTICLE II
## DEFINITIONS

2.01   "Product" shall mean the Software attached hereto as Exhibit A.

2.02   "License" shall mean the right to use the Product as defined in Article III of this Agreement.

## ARTICLE III
## LICENSE

3.01   Subject to the terms and conditions hereof, Vendor agrees to license to the User the License, and User agrees to acquire the License from Vendor, the Product described herein.

3.02   Vendor hereby grants User a perpetual and exclusive license to use and re-license/sublicense the Product for the term hereof.

3.03   The Vendor grants an exclusive License for the North American Continent (the "Territory") for the Product.

3.04 Vendor expressly acknowledges that the right to use the License includes the right of User to reproduce the License upon the terms and conditions as determined by User within the Territory.

## ARTICLE IV

### REPRESENTATIONS

The representations and warranties of the Vendor are as follows:

4.01 The Vendor owns all copyright, trademark or patent rights in any way related to the Product and such copyright, trademark and/or patent does not interfere with nor violate the rights of any other person nor entity.

4.02 The Vendor shall deposit a copy of the source code in escrow with the chartered accounting firm of Labelle, Racicot in Repentigny, Quebec, to be delivered to User in the event of any breach of this agreement by Vendor or the termination of this agreement.

4.03 Vendor warrants that it has sole ownership of and/or the right to license or sublicense the Product described in this Agreement. Vendor further warrants that the Product is non-infringing and free from any rightful claim based on patent infringement, copyright infringement or trade secret violation.

4.04 Vendor warrants that execution and performance of this Agreement do not conflict with or violate the legal rights of any person or entity or any obligation binding on Vendor. Vendor warrants that, as long as User fully performs its obligations under this Agreement, User's use of the Product in accordance with this Agreement shall not be interrupted by any person or entity claiming by or through Vendor.

## ARTICLE V

### PROPRIETARY INFORMATION

5.01 Vendor shall retain title to and ownership of the License hereunder including any modifications, changes, alterations and improvements thereto. All proprietary information shall remain the property of the Vendor.

5.02 User agrees to use its best efforts to protect the License and any other proprietary information provided hereunder. User agrees not to disclose same to others or to duplicate it in whole or in part except as otherwise provided herein.

5.03 User shall not be liable to Vendor, or in breach of this Agreement, in the event it discloses any proprietary information of Vendor which is within the public domain at the time of



disclosure, or is or becomes publicly available without breach of this Agreement by User, or is received by User from a third party holding such information legally and having the legal right to disseminate same, or is disclosed by User with the written approval of Vendor, or is disclosed by Vendor to others on a non-restrictive basis.

5.04  User may modify the License, upon written notice to the Vendor.

## ARTICLE VI
## PAYMENT

6.01  The User agrees to pay to the Vendor the amounts listed in Annex A for each sublicense sold hereunder within thirty (30) days of the actual collection of the payment from sublicensee.

6.02  All payments shall be made in U.S. Dollars.

6.03  Vendor and User agree that the price quoted for the License and/or sublicense(s) to be purchased hereunder does not include sales, use or other taxes which tax shall be the responsibility of the Vendor and/or User, it being understood that no consideration is being paid by User for the License to Vendor.

## ARTICLE VII
## WARRANTIES, REMEDIES, AND LIMITATION OF LIABILITY

7.01  IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR LOSS OF PROFITS OR FOR INCIDENTAL, INDIRECT, SPECIAL, OR CONSEQUENTIAL DAMAGES ARISING OUT OF ANY BREACH OF THIS AGREEMENT, REGARDLESS OF WHETHER THE POSSIBILITY OF SUCH DAMAGES HAS BEEN COMMUNICATED TO THE OTHER PARTY AND REGARDLESS OF WHETHER THE OTHER HAS OR GAINS KNOWLEDGE OF THE EXISTENCE OF SUCH DAMAGES.

7.02  All warranties set forth herein are made to and for the benefit of User and User's lawful successors in interest.  EXCEPT AS OTHERWISE PROVIDED, THE WARRANTIES SPECIFICALLY SET FORTH SHALL BE IN LIEU OF ALL OTHERS, EXPRESS OR IMPLIED, INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, WHICH ARE HEREBY EXCLUDED.

## ARTICLE VIII
## DOCUMENTATION and ISO



8.01   User will require vendor to produce certain forms and other documents, as outlined in Exhibits "B" and as required by user's Quality Management System. User will require these documents as per standards ISO 9001:2000 and ISO 13485:2003, only when related to issues that may impact on products efficiency and safety, by user's determination.

8.02   The User shall have the right to reproduce all Documentation supplied hereunder, provided that such reproduction shall be solely for the use of the User and/or its sublicensees, and further provided that such reproductions shall be subject to the same restrictions on use and disclosure as are contained in Article III of this Agreement.

## ARTICLE IX

## TERMINATION

9.01   (a)   If any of the following events occur by or against either party it shall constitute an event terminating this Agreement: (i) The filing of a petition in voluntary bankruptcy, the filing of a petition for the composition of its affairs or for its corporate reorganization under any state or federal bankruptcy or insolvency law, makes an assignment for the benefit of creditors, admits in writing to its insolvency or liability to pay debts as they mature, or consents in writing to the appointment of a trustee or receiver for itself; (ii) a court of competent jurisdiction enters an order, judgment, or decree declaring either party insolvent, adjudging it bankrupt, appointing a trustee or receiver, or approving a petition filed against either party seeking reorganization, or approving a petition filed against either party seeking reorganization, under any applicable state or federal law, and such order, judgment or decree is not vacated, set aside, or stayed within sixty (60) days from the date of the entry thereof; (iii) under the provisions of any other law for the relief or aid of debtors, any court of competent jurisdiction assumes custody or control of either party's assets, and such custody or control is not terminated within sixty (60) days from the date of assumption thereof; (iv) the failure of User to make the payments to Vendor as provided for herein; (v) any other material breach of this Agreement.

9.02   Within six (6) months of signing agreement, user is anticipating that a minimum of 10 licenses per month will be purchased from vendor, at least until a minimum of 360 end user licenses had been sold. If these quantities have not been attained, user may request one of several options, as these quantities are necessary user to attain profitability. These options can include:



sale of license, or

termination of agreement, or

alternative marketing and distributions strategies.

## ARTICLE X
## INDEMNITY

10.01  Notwithstanding any insurance carried by either party pursuant to this Agreement or otherwise, each party agrees to indemnify, defend and hold harmless the other from all claims, loss, damage or injury of any kind or character, to any person or property arising from any act or omission of either party in the performance of services pursuant to this Agreement, any breach of this Agreement, including all the warranties and representations set forth in this Agreement.

10.02  In the event that either party becomes aware of any claim arising under this Agreement, each party agrees to give the other written notice containing sufficient particulars to identify the name and address of the allegedly injured person, the time, place and circumstances of the alleged incident, and the names of any available witnesses.

10.03  The parties agree to cooperate with each other in the defense of claims and in enforcing any right of contribution or indemnification against any person or organization.

## ARTICLE XI
## GENERAL PROVISIONS

11.01  This Agreement is accompanied by Exhibits A through C.  Each and every Exhibit to this Agreement is incorporated herein by reference in its entirety, the name as though fully set forth at length herein.

11.02  This Agreement supersedes all prior agreements and understandings, constitutes the entire agreement and may not be modified or terminated orally.  Modification, termination, or attempted waiver of any of the provisions hereof shall not be binding unless in writing and executed by the party against whom the same is to be enforced.

11.03  Vendor agrees that any information or data acquired or received by it under this Agreement, or learned in the course of providing services under this Agreement, shall be treated as confidential by the Vendor and shall not, unless required by law, be disclosed to any third party without User's prior written consent.

11.04  This Agreement shall be governed by the laws of the State of New York.



11.05    Neither party shall be deemed in default of this Agreement and shall be excused from liability for any failure to perform or delay in performance if said failure or delay is due to causes beyond said party's reasonable control, including, without limitation, strike, fire, explosion, act of God, riot, war, government regulation, major accident, or failure of suppliers or subcontractors.

11.06    No waiver of any term or condition or the breach of any term or condition of this Agreement by either party shall be taken to constitute a waiver of any subsequent breach of such term or condition nor to justify or authorize the non-observance on any other occasion of the same or any other term or condition hereof.

11.07    Neither party may assign this Agreement without the prior written consent of the other except the User's right to sublicense hereunder.

11.08    Independent Contractor.  The User acknowledges that it is an independent contractor and not an employee of Vendor.  The User agrees to be solely responsible and liable for all of its expenses incurred in performing pursuant to this Agreement and for all taxes, contributions, premiums and all other payments of the User and/or any employee of the User.

### ARTICLE XII

### ARBITRATION

12.01    All disputes of every kind and nature between and arising out of or in connection with this Agreement as to the negotiation, existence, construction, validity, interpretation or meaning, performance, nonperformance, enforcement, operation, breach, continuance, or termination thereof shall be submitted to final and binding arbitration pursuant to the then existing International Chamber of Commerce Commercial Rules of Arbitration.

12.02    Either party may demand such arbitration in writing within one (1) year after any dispute including termination arises, but not thereafter, which demand shall include a statement of the matter in controversy.  The failure to request arbitration shall be deemed a waiver of any claim by the party failing to demand arbitration and shall foreclose any other litigation.

12.03    Each party shall select on disinterested arbitrator from a list submitted by the American Arbitration Association, and the two selected shall select a third arbitrator from the list.

12.04    Each party shall bear its own costs of arbitration.

12.05    Arbitration hearings shall be conducted in London, England, or any jurisdiction that is agreeable to both parties and the award rendered by the arbitrators shall be final and binding on all parties to the proceeding, and judgment on such award may be entered by either party in the highest



court, state or federal, in any jurisdiction.

12.06  The parties agree that the provisions hereof shall be a complete defense to any suit, action, or proceeding instituted in any federal, state or local court or before any administrative tribunal with respect to any controversy or dispute arising during the period of this Agreement and which is arbitrable as herein set forth.  The arbitration provisions hereof shall, with respect to such controversy or dispute, survive the termination of this Agreement for such period of time as is provided in paragraph 11.02 hereof.

12.07  Nothing herein contained shall be deemed to give the arbitrators any authority, power, or right to alter, change, amend, modify, add to, or subtract from any of the provisions to this Agreement.

12.08  The parties expressly agree that all trade secrets, proprietary or confidential information of either party shall be disclosed during arbitration only upon the issuance of appropriate protective orders limiting the disclosure or discoverability of such information outside of the arbitration of this Agreement.



## ARTICLE XIII

## NOTICES

13.01 Any communication provided or permitted hereunder shall be in writing and shall be deemed duly given or made if delivered in person or sent by U.S. registered mail, return receipt requested, postage prepaid, or by telegram, addressed to the party for which it is intended at its address as follows:

VENDOR: Image Level
Nieuwkerkenstraat 29
Nieuwkerken-Waas
9100
Belgium

USER: Synca Marketing, Inc.
337 Marion
Le Gardeur, Quebec J5Z 4W

**IN WITNESS WHEREOF**, and intending to be legally bound, the parties hereto, having been duly authorized, executed this Agreement on the dates indicated:

SYNCA DIRECT, INC.

By: Raymond Monette

Date: June 1st, 2005

IMAGE LEVEL

By: Xavier de Tracy

Date: June 1st, 2005

Exhibit A

## CADI license pricing:

**CADI full network key (without DFO)**     $ 995 US
Price includes new features that are added as CADI evolves, such as report writer, etc., unless otherwise agreed between both parties. Also includes CADI-data, Smart-link and other utilities that may be required to operate CADI in particular environments.

**CADI basic**     $ 99 US
**Upgrade to CADI from CADI basic**     $ 199 US
    $ 896 US
CADI basic is available to Synca in quantities equal to or less than the quantities of CADI full network keys at a price of $99. Additional quantities are available for $199 US

**DFO**     $ 800 US
**DFO with VTO STO**     $1200 US
**Addition of VTO STO to DFO**     $ 400 US

**UPGRADES TO CADI**     $ 110 US
\* per year, payable when upgrading key. Upgrades included for 12 months from date of sale.

**UPGRADES TO DFO/VTO/STO**     $ 110 US
\* per year, payable when upgrading key. Upgrades included for 12 months from date of sale.

**ADDITIONAL LICENSES TO SAME CLIENT**     ½ price
User will provide vendor with client name and multiple addresses

Notes:

Database transfers for popular US imaging products, as well as PM integration products are included in the above prices.

DFO analysis' that are popular in the USA and Canada will be programmed and added to DFO at no additional cost. Custom DFO analysis' will be quoted on an individual basis.



Exhibit "B"




Exhibit "B"

**PRODUCT DEVELOPMENT RISK ANALYSIS:** (TYPE IN PRODUCT NAME HERE)

| IDENTIFIED RISK | TYPE OF RISK | RISK LEVEL 1 | 2 | 3 | Prescribed action(s) / Notes |
|---|---|---|---|---|---|
| Risks regarding product efficiency | | | | | |
| Risks regarding safety within prescribed usage | | | | | |
| Risks regarding safety, dealing with unprescribed usage | | | | | |

Types of risks:
Process-related risks (PS)
Product-related risks (PT)

Risk levels:
1: Unacceptable
2: As low as reasonably acceptable
3: Acceptable

Product manager:
Date:

PRODUCT DEVELOPMENT RISK ANALYSIS TEMPLATE
OWNER: Stephane Arsenault
F20.10.2G
Created 2004-12-20    Update # 1    Last updated on 2005-01-10
2 of 3

**Product Design Mandate Form**

Product name:
Mandate issued by:                    Date:

Section 1 – Deliverables

Section 2 – Applications

Section 3 – Targeted market(s)

F20.10.3G Product Design Mandate Form    Created on 2005-03-11  Last revised on 2005-03-11  Update #0    Page 1 of 2

Section 4 – Budget / Resources

Section 5 – Commercial parameters (is this a Synca alone project, a joint venture?)

Section 6 – Misc. Notes

Due date:
Designated Project Manager:
Mandate Issuer Signature:

F20.10.3G Product Design Mandate Form    Created on 2005-03-11  Last revised on 2005-03-11  Update #0    Page 2 of 2

